

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

GEORGE  BRYANT;  LABARRON  )
BYRON;  RODNEY  FREEMAN;  )
DANA  HAMPTON;  JERMAINE  )
HARDIN;  ERIC  HERROD;  )
CHARLES PATTON; QUENTOLYN  )
SNEED;  WILLIAM  TATUM;  )
LOVELL  TRAVIS;  URIAL  L.  )
TURNER,  JR.  on  behalf  of  )
themselves  and  all  other  black  )
persons similarly situated,  )
　　　　　　　　　　　　　　　　)　　　**CASE NO. 2:10-CV-3215-SLB**
　　　　　　**Plaintiffs,**　　　　)
　　　　　　　　　　　　　　　　)
　　　　**vs.**　　　　　　　　　)
　　　　　　　　　　　　　　　　)
SOUTHLAND TUBE,  )
　　　　　　　　　　　　　　　　)
　　　　　　**Defendant.**　　　　)

## MEMORANDUM OPINION

This case is presently pending before the court on plaintiffs' Motion for Class Certification.  (Doc. 24.)[1]  Plaintiffs have sued their employer, defendant Southland Tube, alleging that it discriminated against them on the basis of their race, African American.  They have moved the court for an order certifying a class of African-Americans who are or were employed by defendant at any time since November 23, 2006.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

court is of the opinion that plaintiffs' Motion for Class Certification, (doc. 24), is due to be denied.

## I. <u>STANDARD OF REVIEW</u>

"Class actions serve an important function in our system of civil justice. They present, [however], opportunities for abuse as well as problems for courts and counsel in the management of cases. Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99-100 (1981)(citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974))(footnotes omitted).

"[T]he first essential ingredient to class treatment is the ascertainability of the class. . . . [T]he named plaintiff must define the proposed class in a manner that adequately identifies its members. Who, exactly, are they, and how can they be located?" *Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 663-64 (N.D. Ala. 2010).

If the named plaintiffs establish an identifiable class, "Rule 23 explicitly requires that in order to proceed as a class the plaintiff[s] must establish the 4 prerequisites in Rule 23(a)." *Id*. at 664; *see also Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000). Subsection (a) of Rule 23 states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as the prerequisites of numerosity, commonality, typicality, and adequacy of representation." *Prado-Steiman*, 221 F.3d at 1278 (citing, *inter alia*, *General Telephone Co. v. Falcon*, 457 U.S. 147, 156 (1982)). The Rule 23(a) requirements "are designed to effectively limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims." *Id.* (quoting *Falcon*, 457 U.S. at 156).

In addition to the four prerequisites of Rule 23(a), plaintiffs must also demonstrate that their proposed class "fit[s] within at least one type of class action recognized in Rule 23(b)." *Grimes*, 264 F.R.D. at 664. Subsection (b) states:

> A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > (1) prosecuting separate actions by or against individual class members would create a risk of:
> >
> > > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the

3

other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2)  the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3)  the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

   (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;

   (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;

   (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

   (D)  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

In making these determinations, "[t]he court's role . . . is not to decide the merits of the case, but rather to determine whether the purported class representative satisfies the procedural requirements for class certification." *Henderson v. Thomas*, 289 F.R.D. 506, 508 (M.D. Ala. 2012)(citing *Eisen*, 417 U.S. at 177–78).  Therefore, "[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v.*

*Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1195 (2013)(citations omitted).

Recently, the Supreme Court explained:

> Repeatedly, we have emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. [*Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011)](quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).  Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim.  [*Id.*] at 2551.  That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  [*Id.*] (quoting *Falcon*, [457 U.S.] at 160, 102 S. Ct. 2364).

> The same analytical principles govern Rule 23(b).  If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-624, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).  Rule 23(b)(3), as an "adventuresome innovation," is designed for situations in which class-action treatment is not as clearly called for.  *Wal–Mart*, . . . 131 S. Ct., at 2558 (quoting *Amchem*, 521 U.S., at 614-615, 117 S. Ct. 2231).  That explains Congress's addition of procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (e.g., an opportunity to opt out), and the court's duty to take a "close look" at whether common questions predominate over individual ones. *Id.*, at 615, 117 S. Ct. 2231.

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)(internal quotations omitted).

## II.  STATEMENT OF FACTS

Defendant Southland Tube is a private company owned by John Montgomery.  (Doc. 32-32 at 5.)[2]  Defendant manufactures "electric resistance welded tubular product," or steel

---

[2]Citation to page numbers of depositions are to the page numbers in the original

tubes, in Birmingham, Alabama.  (*Id*. at 7-8; doc. 27-7 at 5, 20.)  The named plaintiffs are current and former employees of defendant.[3]  Plaintiffs worked on the production side of defendant's operations, which is referred to as "the Mill."  According to plaintiffs, "[t]his case involves the Productions Mills and the Maintenance Department."  (Doc. 24 ¶ 1.)

The Mill consists of five separate Mills, as well as the Shipping Department, the Slitter Department, the Warehouse, the Changeover Area, and the Maintenance Department, which includes Electrical Maintenance and Mechanical Maintenance.  (Doc. 27-1 at 36; doc. 27-7 at 106; doc. 32-32 at 29.)  About half of the Mill employees are African-American. (Doc. 27-1 at 36.)

The Operations Manager, who reports directly to Montgomery, oversees the Mill. Julian Swann was the Operations Manager until January 2011, when Mike Patzke became the Operations Manager.  (Doc. 27-7 at 7; doc. 32-24 ¶¶ 1-2.)  As of February 12, 2013, defendant had five Superintendents responsible for distinct areas in the Mill, and, between 2006 and February 12, 2013, the Superintendents reported directly to the Operations Manager and/or the Manufacturing Manager.  (Doc. 27-7 at 9; doc. 32-24 at 6.)  During the relevant

---

deposition and not to the page numbers assigned by the court's electronic filing system.  All other citations to page numbers refer to the page number assigned to the document by the court's electronic filing system.

[3]Plaintiffs George Bryant, Labarron Byron, Dana Hampton, Jermaine Hardin, Eric Herrod, Charles Patton, and Urial L. Turner, Jr., were employed by defendant on July 10, 2012.  (*See* docs. 32-17 and 32-18 [Corrected Job and Salary History Report for Employees Since January 1, 2006 (hereinafter "Job and Salary Report")].)  Plaintiffs Rodney Freeman, Quentolyn Sneed, William Tatum, and Lovell Travis separated from defendant before July 10, 2012.  (*Id*.)

period, defendant has had two African-American Superintendents, Patrick King and Eric Peterson.  (Doc. 27-1 at 48; doc. 27-7 at 18-19; doc. 32-24 at 6.)

Each area of the Mill and each shift has a Front-Line Supervisor.  (Doc. 27-7 at 19-20.)  Defendant has had 18-22 Front-Line Supervisors at any given time and they report directly to the Superintendents.  (*Id*. at 10; doc. 32-24 at 6.)  During the relevant time period, defendant has had four African-American Front-Line Supervisors:  Larry Orr, Winfred White, Erick Kennedy, and Layton Andrews.  (Doc. 27-1 at 48-49, 52; doc. 27-7 at 19-22.)  None of the named plaintiffs is a Front-Line Supervisor.

 The entry-level positions in the Mill are Stacker and Bander; as of February 13, 2013, Banders were paid between $10.80 to $14.75 per hour.  (*Id*. at 23; doc. 32-24 ¶ 6; doc. 32-23 at 5.)  Next in the hierarchy of production positions are Crane Operator, Forklift Driver, Packaging Line Operator, Change Over Person, Coil Loader, Coil Receiver, End Welder and Saw Operator/Cut-Off Operator.[4]  (Doc. 32-24 ¶ 6.)  These jobs overlap and production employees do not move through the positions in any sort of progression.  (*Id*.)  The highest paid hourly positions are Mill Operator – employees in this position as of February 13, 2013,

---

[4]Of these positions, Crane Operator had the lowest hourly wage rate, $10.80, and Change Over Person had the highest hourly wage rate, $19.25, among the employees in these positions on February 13, 2013.  (Doc. 32-23 at 5.)  The "Pay Ranges for Current Employees in Specific Positions as of February 13, 2013," for these positions are:  (1) Crane Operator, $10.80 to $18.00 per hour; (2) Forklift Driver, $12.00 to $16.00 per hour; (3) Packaging Line Operator, $12.80 to $17.50 per hour; (4) Change Over Person, $11.25 to $19.25 per hour; (5) Coil Loader, $12.05 to $17.25 per hour; (6) Coil Receiver, $14.80 to $18.75 per hour; (7) End Welder, $13.00 to $17.25 per hour; and (8) Cut Off Operator, $13.30 to $18.25 per hour.  (*Id*.)

were paid $14.00 to $21.40 per hour, and Floater – employees in this position were paid $14.50 to $19.75 per hour.  (Doc. 27-7 at 25; doc. 32-24 ¶ 6; doc. 32-23 at 5.)  Employees in the Floater and Front-Line Supervisors positions should be able to perform each job in the Mill.  (Doc. 27-1 at 98; doc. 27-5 at 41.)

Defendant has no formal application process for promotions.  (Doc. 27-1 at 53; doc. 27-7 at 89.)  Prior to June 2011, it did not post available positions; however, since June 2011, defendant has posted its available hourly positions on its web site.  (Doc. 27-1 at 101-02.)  Defendant's Human Resources Director testified that defendant did not need to post available positions internally because everyone in the Mill knew about the vacancies; he stated, "There is not one soul out in the mill that doesn't know about an opening when it occurs, if not an hour later.  We are not a big place."  (*Id*. at 27.)  Plaintiffs disagree and testified that they were unaware of available positions.  (*See*, *e.g.*, docs. 27-9 at 4, 19, 27, 31.)

When filling an available position in the Mill, defendant has a preference for promoting from within.  (Doc. 27-1 at 23; doc. 27-7 at 23.)  It considers an employee's "bench strength" – how well he performs his current job, his willingness to work, and his dependability – "The first thing you do is look at their attendance, if they are a person that is at work everyday[,] that you can depend on them to be there."  (Doc. 27-7 at 90; doc. 27-5 at 33.)  Recommendations for promotions to hourly positions in the Mill were made by the Front-Line Supervisors, with final approval by the Operations Manager.  (Doc. 27-1 at 22.)  Swann testified he had input into the selection of the person to promote to a Front-Line

Supervisor or Superintendent position.  (Doc. 27-7 at 8-9.)  However, he testified that he did not have input into the selection for promotion to a position below the position of Front-Line Supervisor.  (*Id*. at 9.)  Swann testified:

> Q.  [A promotion is] a subjective decision left to you and your superintendent staff?  . . .
>
> A.  From bander to operator? No, I wouldn't.  I would listen to the front line supervisor [and/or] superintendent, but ultimately, it would be their decision.  I would back them in their decision, unless they could talk me out of a reason.  I [cannot] recall overriding one of those.
>
> Q.  But you would take their recommendation and be the approval process?
>
> A.  Yes.

(*Id*. at 151-52.)

Employees are referred to their Front-Line Supervisors if they express an interest in being promoted.  Swann testified that he referred any employee seeking a promotion to his Front-Line Supervisor because he was not involved in the selection of employees for a position below Front-Line Supervisor.  (*Id*. at 9, 150.)

Defendant has no formal procedure for training its production workforce for promotion or transfer.  (Doc. 27-5 at 38; doc. 32-24 ¶ 6.)  Front-Line Supervisors and Superintendents select workers to receive on the job training while a mill is running or between shifts at changeover.  (Doc. 27-7 at 65-67; doc. 27-5 at 37-38.)  Swann testified:

> Q.  And how are persons selected for [training]?

9

A.  By their incentives, their initiative to learn the job or show that they're interested.

. . .

Q.  There's no formal apprenticeship program for someone to apply saying I would like to be considered for . . . a certain position?

A.  Formally?  No, not formally.  But yes, if the individual [came] by and said, ["H]ey, I'd like to learn to do this,["] certainly, we would listen to that individual.

Q.  And then if you had that, such a case, would they be given time to operate the machine or –

A.  There might not be time to operate it, but there would be time for him to demonstrate – during changeover, for example.  A changeover lasts four to six hours.  If he was an individual that wanted to learn to operate a machine, he would demonstrate during that time an eagerness to learn tooling, learn mics, learn how to read mics, learn systems.  During the threading up of the tube mill, he [could ask] ["]show ne how["] – . . . ["]teach me as we go here.["]

Q.  And in terms of who was selected for this teach-me-as-we-go, that's, again, up to the supervisory staff?

A.  Yes.

(Doc. 27-7 at 65-67.)  Also, Swann testified that the Operations Manager did not necessarily have any input into or approval of these selections for training by the Front-Line Supervisors and Superintendents. (*Id*. at 67.)

At some time prior to 2011, defendant offered some training through Jefferson State Community College.  (*See* doc. 27-7 at 162.)  Employees were selected for this training by informing the Human Resources Department of their interest in the training.  (*Id*. at 162-63.)

10

This training, according to Swann, included "some hydraulic classes" and "some PLC classes." (*Id.* at 162.)

Normally, defendant gives pay increases "across the board" as a percentage raise. (Doc. 27-7 at 42.)  The initial recommendation for annual raises is made by the Operations Manager and the Human Resources Director, and Montgomery makes the final decision based on this recommendation.  (Doc. 32-32 at 12.)  The same process is used to decide whether defendant will give year-end bonuses.  (Doc. 32-32 at 50.)  However, merit raises for production employees are made based on the recommendation of the Front-Line Supervisors; these recommendations are then approved by the Director of Operations.  (Doc. 27-7 at 62-63.)   Merit raises are given when the Front-Line Supervisor reports that an employee "has advanced in the position that he is in" or he has "demonstrated that he has progressed to a certain position beyond where he was at."  (*Id.* at 92, 98.)  The Operations Manager has final approval of merit raises in the Mill.  (Doc. 27-7 at 92.)

### THE NAMED PLAINTIFFS

**1. George Bryant**

Plaintiff George Bryant, a current Southland Tube employee, has worked for Southland Tube since December 14, 2004.  (Doc. 27-9 at 3, ¶ 7; *see also* doc. 32-17 at 93.) He began working for defendant as a Crane Operator in Mill 3.[5]  His starting pay rate was

---

[5]The Job and Salary Report indicates that Bryant started his employment with defendant on December 14, 2004, as a Crane Operator.  (Doc. 32-17 at 93.)  However, in his Declaration, Bryant testified that he started as a Stacker and moved to Bander before being

$8.30; he was given a $.50 per hour raise after 90 days on March 14, 2005. (Doc. 32-17 at 93.) Two and a half months later on May 30, 2005, he received an increase to $9.30 as an annual raise; at this time he was a Crane Operator in Mill 1. (*Id.*) Less than six months later, on October 3, 2005, Bryant was given a merit raise of $.50 per hour to $9.80 per hour; he was a Crane Operator in Mill 3. (*Id.* at 94.) Thereafter, he received annual raises on May 29, 2006, to $11.66; on May 21, 2007, to $12.25, and on May 30, 2010, to $13.50; he remained a Crane Operator in Mill 3. (*Id.*) Bryant received a second merit raise on August 30, 2010, of $1.00 an hour to $14.50, and an annual raise the following May 27, 2011, to a total of $15.00.

Bryant was promoted to a Truck Driver position in Mill 4 and received a pay increase to $15.75 on September 26, 2011. (*Id.*) On January 23, 2012, he was transferred to the Trucking Department and his pay rate remained the same. (*Id.*) However, on May 27, 2012, he received an annual raise in his hourly rate to $16.25. (*Id.*)

Bryant testified that he wanted to be promoted to Saw Operator, Mill Operator, and Supervisor. (Doc. 27-9 at 4, ¶10.) He contends that he has been denied the opportunity to apply for open positions because defendant does not post available positions.[6] (*Id.* ¶ 11.) He also contends he was denied the training needed for these positions. (*Id.* ¶ 12.)

---

promoted to Crane Operator in June or July of 2005. (Doc. 27-9 at 3, ¶ 8.)

[6]The court notes that Bryant also testified that he had turned down a promotion to Saw Operator and/or Table Operator "because throughout [his] years of employment [with defendant], [he had] ***applied*** for positions and was never given the opportunity to receive the training needed for those positions." (Doc. 27-9 at 4, ¶ 13 [emphasis added].)

### 2. Labarron Byron

On June 29, 2005, Labarron Byron began working for defendant as a Bander on Mill 3 at the hourly rate of $8.00 per hour.  (Doc. 32-17 at 96.)  One month later, he received a merit raise of $.30 per hour, and, after 90 days, he received another raise of $.50.[7]  (*Id.*)  On or about March 17, 2006, defendant raised Byron's hourly rate to $9.30, following his promotion to Crane Operator in the Slitter Department.  Two months later he received an annual raise to $11.07 per hour, and, less than three months after that, he received a merit raise to $12.50 per hour.

On August 21, 2006, fourteen days after receiving a merit raise, Byron received a promotion to Slitter Operator and his pay rate was increased to $13.25.  The following January, Byron moved from second shift to first shift on Slitter 2; his pay was not adjusted. (*Id.*)  Byron remained a Slitter Operator on Slitter 2 until at least July 10, 2012.  (*Id.*)  On February 20, 2007, he received a raise to $14.25; the reason given on the Job and Salary Report is "PRO INC."  (*Id.*)  In May 2007, Byron received an annual raise to $14.75 per hour; he received a merit raise less than one month later to $15.50.  (*Id.*)  Except for 2009, from 2008 to 2012, Byron received a $.50 an hour annual raise; his hourly rate as of July 10, 2012, was $18.00 per hour.  (*Id.*)

---

[7]Byron testified that he has "never received a merit raise."  (Doc. 27-9 at 9, ¶ 8.)

Byron testified that he wanted training as a Mill Operator and to be promoted to Mill Operator. (Doc. 27-9 at 9, ¶ 10.) He stated that, in 2010, he asked Lance Swann for training as a Mill Operator, which he never received. (*Id.*)

### 3. Rodney Freeman

Plaintiff Rodney Freeman, a former employee of defendant, began working for defendant on February 16, 2005, as a Stacker on Mill 2 at an hourly rate of $8.00. (Doc. 32-18 at 13.) After 90 days, his pay rate was increased $.50; three months later he received a merit raise to $9.00 per hour.[8] (*Id.*) The Job and Salary Report indicates that Freeman, then a Stacker on Mill 1, received an annual raise to $10.71 per hour on May 22, 2006, and another annual raise the following year to $11.25 per hour. (*Id.*) He received a merit raise on November 12, 2007, to $11.75 per hour. (*Id.*)

On or about February 11, 2008, Freeman was promoted to Cut Off Operator on Mill 1 and he received a raise to $12.25.[9] (*Id.*) Three months later he received an annual raise to $12.75. On October 20, 2008, Freeman was promoted again, this time to Mill Operator on Mill 1, and his pay rate was not increased. (*Id.*) However, on March 30, 2009, his pay rate

---

[8]Freeman testified that he "never received a merit or incentive-based raise." (Doc. 27-9 at 14, ¶ 10.)

[9]Freeman testified he was promoted to Cut Off man one month after he started working for defendant, and that he "did not receive a pay raise for this position change until 2½ to 3 years later." (Doc. 27-9 at 13, ¶ 7.) The Job and Salary Report indicates that Freeman was promoted to Cut Off Operator on February 11, 2008, three years after he starting working for defendant, and defendant gave him a raise from $11.75 to $12.25 per hour the same day. (Doc. 32-18 at 13.)

14

was increased to $13.50 per hour.[10]  (*Id*.)  On August 17, 2009, he resigned or was fired based on his refusal to sign a document indicating he had been trained as a Mill Operator.  (*Id*.; doc. 27-9 at 13-14, ¶¶ 9-10; doc. 27-1 at 66, 69-70.)

Freeman testified that he wanted a position in the Maintenance Department.  (Doc. 27-9 at 14, ¶ 11.)  He has welding experience and a welding certificate; however, he was told by his supervisor that the Maintenance Department has no available positions.   (*Id*.)  Nevertheless, shortly thereafter, a white male was hired to work in the Maintenance Department.  (*Id*.)

### 4. Dana Hampton

Plaintiff Dana Hampton was hired by defendant on January 31, 2006, as a Janitor on Mill 1 making $8.00 per hour.[11]  (Doc. 32-18 at 18.)  He received a $.75 raise after 90 days and annual raises on May 22, 2006, and May 21, 2007.  (*Id*.)  As of May 21, 2007, his pay rate was $11.00.  (*Id*.)  On July 31, 2007, he received a merit raise to $11.50 per hour.[12]

---

[10]Freeman contends that when Mike Tucker, a white employee, was promoted to Mill Operator he had received a $.50 raise and "then another raise of $1 or more."  (Doc. 27-9 at 13, ¶ 7.)  The Job and Salary Report indicates that Tucker was promoted to Mill Operator on January 19, 2009, and that his hourly rate of $14.50 was not increased until April 6, 2009, when he received a $.75 merit raise.  (Doc. 32-18 at 74.)  He received two more merit raises, on June 29, 2009, and September 29, 2009, raising his hourly rate to $17.00.  (*Id*.)

[11]Hampton first worked for defendant in the 1990s before it was owned by John Montgomery.  (Doc. 27-9 at 18, ¶ 7.)  He was terminated because his Supervisor considered him "too slow."  (*Id*.)

[12]Hampton denies he ever received a merit raise.  (Doc. 27-9 at 19, ¶ 10.)

On May 26, 2008, Hampton was promoted to Stacker on Mill 1 and his hourly rate was increased to $12.00 per hour.  (*Id*.)  He received an annual raise to $12.50 per hour on May 24, 2010.  (*Id*.)

He was promoted to Crane Operator on Mill 3 on September 16, 2010; his hourly rate remained $12.50 per hour.  (*Id*.)  However, a month later, he received a merit raise to $13.50 per hour, and, on May 27, 2011, he received an annual raise to $14.00 per hour.  (*Id*.).

On July 21, 2011, defendant promoted Hampton to Packaging Line Operator on Mill 4; it increased Hampton's hourly rate to $15.00.  (*Id*.)  On May 27, 2012, Hampton received an annual raise to $15.50 per hour.

Hampton wanted to be promoted to Saw Operator, Mill Operator, or Front-Line Supervisor; however, because he never knows when positions are open, he has been denied the opportunity to apply for a promotion.  (Doc. 27-9 at 19, ¶ 11.)  He also claims that he has been denied the opportunity to train for a position in the Maintenance Department and for the positions of Front-Line Supervisor, Saw Operator, or Mill Operator.  (*Id*. ¶ 12.)

### 5. Jermaine Hardin

Plaintiff Jermaine Hardin was hired as a Stacker on Mill 2 on September 6, 2005, at a pay rate of $8.30 per hour.  (Doc. 32-18 at 19.)  He was transferred to a Bander position in Mill 3 on December 12, 2005, and his pay rate increased to $9.05.  (*Id*.)  He received an annual raise to $10.77 on May 22, 2006.

16

He was promoted to Crane Operator in the Shipping Department on July 27, 2007; he was given a merit raise to $12.00 per hour a month later.[13]   The Job and Salary Report indicates that Hardin was a Crane Operator in either the Shipping Department or Mill 3 from July 27, 2007, until June 9, 2011.  (*Id.*)  During this time period he received annual raises for each year, except 2009, raising his hourly rate to $14.25 as of May 27, 2011.  (*Id.*)  On June 9, 2011, he was transferred to Mill 5, and he received an annual raise on May 27, 2012, bringing his hourly rate to $14.75.  (*Id.*)  On June 5, 2012, he was transferred back to the Shipping Department; his hourly rate was unchanged.  (*Id.*)

Hardin testified that he wanted to be promoted to positions of Mill Operator, Saw Operator, Coil Loader, and Forklift Operator; however, he was never offered these positions or given the opportunity to apply for them because job openings were not posted.  (Doc. 27-9 at 23, ¶ 9.)  He also asserts that he was never given the opportunity to train for these positions.  (*Id.*)

### 6.  Eric Herrod

Plaintiff Eric Herrod was hired by defendant on July 13, 2005, as a Stacker on Mill 1 at the hourly pay rate of $8.00.  (Doc. 32-18 at 22.)  He received a $.50 raise after 90 days and an annual raise to $10.12 on May 22, 2006.  (*Id.*)  On August 27, 2006, he was moved to the Bander position.  Thereafter he received annual raises on May 21, 2007 and May 26, 2008, bringing his hourly rate to $11.50.  (*Id.*)  On September 21, 2009, Herrod moved back

---

[13]Hardin denies he ever received a merit raise.  (Doc. 27-9 at 24, ¶ 10.)

to the Stacker position.  (*Id*.)  At this time his hourly rate was increased to $12.50, and he subsequently received two annual raises that brought his hourly rate to $13.50 as of May 27, 2011.  (*Id*.)

On July 21, 2011, Herrod was promoted to Crane Operator on Mill 4, but he did not receive a pay increase at this time.  He received an annual raise to $14.00 per hour on May 27, 2012.  (*Id*.)

Herrod testified that he wanted to be promoted to Front-Line Supervisor; however, he was never given the opportunity to apply for a Supervisory position because he was unaware when the positions were available. (Doc. 27-9 at 27, ¶ 9.)   He also wanted "to receive training on the [packaging] line; however, [he has] been denied that opportunity." (*Id*. ¶ 10.)

### 7.  Charles Patton

Defendant hired plaintiff Charles Patton on December 4, 2004, as a Stacker on Mill 1 at a starting pay rate of $8.30 per hour.  (Doc. 32-18 at 47.)  Patton received a pay raise of $.75 after 90 days and an annual raise to $9.40 per hour two months later on May 30, 2005. On January 3, 2006, he was transferred to a Bander position and his hourly rate was increased to $9.90.  (*Id*.)  He received an annual raise to $11.78 per hour on May 22, 2006.  (*Id*.)

Defendant promoted Patton to Coil Loader on January 15, 2007, and increased his hourly rate $1.00 to $12.78 per hour.  Patton received annual raises on May 21, 2007, May 26, 2008, and May 24, 2010; his hourly rate as of May 24, 2010, was $14.50. (*Id*.)

18

Defendant promoted Patton again on September 14, 2010, this time to Truck Driver in the Trucking Department. (*Id*.) Patton's hourly rate was not increased at this time. (*Id*.) However, he received a "PRO INC" raise to $15.25 per hour on November 1, 2010, and he was assigned to the Slitter Department. (*Id*.) Patton received an annual raise on May 27, 2011, to $15.75. Three months later he was given a merit raise to $16.50 per hour. (*Id*.) On May 27, 2012, he received an annual raise bringing his hourly rate to $17.00. (*Id*.)

Patton testified that he wanted to be promoted to Front-Line Supervisor and to a position in the "parts room," but defendant never gave him an opportunity to apply for such a position. (Doc. 27-9 at 31, ¶ 10.) He also contends that he was denied training opportunities for welding and "for the positions [he has] worked."[14]

### 8. Quentolyn Sneed

Plaintiff Quentolyn Sneed began working for defendant as a Crane Operator in the Shipping Department on August 4, 2008, at an hourly rate of $10.50. (Doc. 32-18 at 64.) After 90 days, on November 17, 2008, his hourly rate was increased to $11.00, and, a week later, he received a $.35 raise for a shift change. (*Id*.) He was reassigned to Mill 3 without an increase in pay on March 23, 2009. (*Id*.) He received a merit raise to $12.35 per hour on June 15, 2009.

---

[14]Patton testified that he wanted to be trained by a Front-Line Supervisor. (Doc. 32-9 at 59.) Nevertheless, he testified that he was trained on the proper way to perform his jobs and that he did not have any difficulty performing his jobs based on a lack of training. (*Id*. at 62.)

19

Defendant terminated Sneed on February 2, 2010.  (*Id.*)

### 9.  William Tatum

On February 26, 2008, plaintiff William Tatum began working for defendant as a Bander on Mill 2 at the hourly rate of $9.80.  (Doc. 32-18 at 70.)  He received an annual raise to $10.50 per hour; the Job and Salary History Report indicates that Tatum was working on Mill 1 at this time.  (*Id.*)

Defendant promoted Tatum to Forklift Operator on Mill 3 on October 9, 2008, but it did not increase his pay at this time.  (*Id.*)  However, four days later, on October 13, 2008, Tatum received a merit increase to $11.50 per hour and he was assigned to Mill 1.  (*Id.*)

Less than a year later, on August 3, 2009, defendant transferred plaintiff, without a pay increase, to Crane Operator in Mill 3.  (*Id.*)  On October 12, 2009, Tatum received a merit increase to $12.50 per hour.  (*Id.*)  He was transferred to the Shipping Department on January 13, 2010, and, on May 24, 2010, he received a $.50 merit raise.  Eleven days later, he was transferred back to the Shipping Department.  (*Id.*)

On September 13, 2010, defendant promoted Tatum to Packaging Line Operator on Mill 3.  (*Id.*)  His hourly rate was increased to $14.00 on January 3, 2011, and he received an annual raise to $14.50 per hour on May 27, 2011.  (*Id.*)  Tatum was transferred to Mill 5 on June 9, 2011, without an increase in pay.  (*Id.*)  Defendant terminated Tatum on January 10, 2012.  (*Id.*)

### 10. Lovell Travis

Defendant hired plaintiff Lovell Travis as a Shipper/Tarper in the Shipping Department on June 10, 2005.  (Doc. 32-18 at 73.)  Travis's starting hourly rate was $9.00; after 90 days he was given a $.50 raise.  (*Id.*)  On January 16, 2006, defendant gave Travis a merit raise to $10.00 per hour.  (*Id.*)

On May 22, 2006, Travis was promoted to Forklift Operator, and his hourly rate was increased to $11.90 per hour.  (*Id.*)  He received annual raises on May 21, 2007, and May 26, 2008, bringing his hourly rate to $14.00 per hour.  On March 2, 2009, defendant terminated Travis.  (*Id.*)

### 11. Urial L. Turner, Jr.

On January 17, 2005, defendant hired plaintiff Urial Turner as a Stacker on Mill 2 at the hourly rate of $8.30. (Doc. 32-18 at 74.)  After 90 days, his hourly rate was increased to $8.80.  (*Id.*)  He was moved to Mill 3 and received a merit raise on August 1, 2005, and another merit raise on January 3, 2006, bringing his hourly rate to $9.80.[15]

On March 27, 2006, Turner was promoted to Packaging Line Operator and given a raise to $10.80 per hour.  (*Id.*)  He received annual raises on May 22, 2006, and May 21, 2007, which brought his pay rate to $13.50 per hour.  (*Id.*)

Turner was transferred back to the Stacker position on May 26, 2008; at this time his hourly rate was raised to $14.00.  (*Id.* at 75.)  From June 30, 2008, until July 27, 2008, Turner

---

[15]Turner denies that he ever received a merit raise.  (Doc. 27-9 at 36, ¶ 8.)

worked as a Crane Operator at the pay rate of $14.60 per hour.  (*Id*.)  He returned to the Stacker position at $14.00 per hour from July 28, 2008, until October 20, 2008, when he was moved back to the Crane Operator position without an increase in pay.  (*Id*.)  On May 24, 2010, Turner received an annual raise to $14.50 per hour.  (*Id*.)

Turner was promoted to Coil Loader on June 15, 2010; his pay was not increased. (*Id*).  He received annual raises on May 27, 2011, and May 27, 2012, which brought his hourly rate to $15.50.  (*Id*.)

Turner testified that he wanted to be promoted to Packaging Line Operator, Saw Operator, or Mill Operator and that he had "expressed [his] interest in these positions repeatedly."   (Doc. 27-9 at 36, ¶ 9.)  He has also expressed his interest in being trained as a Saw Operator and Mill Operator, but defendant did not give him these training opportunities.  (*Id*. ¶ 10.)

## PLAINTIFFS' EXPERT

Plaintiffs have filed a report prepared by Carey Grigg, an expert in probability and statistical analysis.  (Doc. 27-10 at 3.)  Grigg's "Summary of Hourly Wage Distribution and Comparison of Hourly Wages and Bonuses with Respect to Ethnicity at Southland Tube Company (2006-2011)," contains the following "Conclusions:"

> 1. . . . [A]n the end of each year of the period 2006-2011, the distribution of hourly wage rates among black employees fell primarily in the lower part of the range (i.e. the population of black employees was concentrated in the lower wage brackets).  The distribution [of] hourly wage rates among white employees fell more evenly over the range.

22

2. . . . [A]n the end of each year between 2006-2011, more black employees were earning below the median hourly wage than were earning above the median hourly wage by a ratio of approximately 3:2. The opposite was true for white employees; more white employees earned above the median hourly wage than earned below the median hourly wage by a ratio of 3:2 or greater in each of these years.

3. . . . [W]hen comparing black employees to white employees with the same job and years of experience, the black employees earned, on average, a lower hourly rate and had smaller bonuses than the white employees in all years except 2007, in which the opposite was true.

(Doc. 27-10 at 18.) Grigg based his conclusion on summaries he produced from hourly bonus worksheets. (Doc. 32-17 at 44-45, 49.)

Grigg did not use a linear regression model to determine whether race was a statistically significant factor in compensation. (*Id*. at 25-27.) He testified that he did not have sufficient data on other factors that "would go into a decision about how much to compensate someone," such as "education level, presence of a criminal history, year-end analyses of employee performance, [and] performance reviews." (*Id*. at 27.) He also testified that he "would [have] like[d] to review . . . the hiring, the way the decisions are made at Southland in terms of raises, initial hiring rates and determine what factors [Southland] considered." (*Id*. at 51.)

He testified that his Report, which was based on wage rates and distribution around the median pay rate, did not provide a "statistical conclusion" that compensation was based on race or was "caused by random noise." (*Id*. at 65-66; *see also id*. at 67-70.) His tables and graphs, therefore, "don't represent a conclusion of the statistical significance" of the

numbers.  (*Id*. at 70.)  He stated, "[Y]ou can't conclude from looking at this report . . . the reasons for why the distribution appears to be what it is."  (*Id*. at 67.)  Likewise, he termed his comparisons of white employees and African-American employees with the same job title and years of service to be "a measurement and not a statistical analysis" – meaning "there is a measurable difference between employees who have the same number of years of experience and position."  (*Id*. at 74-75.)  However, he could not say that the "measurable difference" was because of race; "[o]ther than that there is a difference, [he could not] make a conclusion about why there [was] a difference."  (*Id*. at 76.)

Grigg did not analyze or otherwise examine any data regarding promotion or training decisions.  (Doc. 32-17 at 40-41.)

### III. <u>DISCUSSION</u>

**A. CLASS DEFINITION**

Plaintiffs seek to certify a class of "[a]ll African American individuals who have been employed at Southland Tube, Inc., in Birmingham, Alabama, working in one of the Production Mills and/or Maintenance Department at any time from November 23, 2006 to the present." (Doc. 24 ¶ 1.) This class definition "adequately identifies its members." *See Grimes*, 264 F.R.D. at 663-64.

**B. RULE 23(a) PREREQUISITES**

**1. Numerosity – Fed. R. Civ. P. 23(a)(1)**

To certify a class, this court must find that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In dicta, the Eleventh Circuit has held, "[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)(citing 3B Moore's Federal Practice ¶ 23.05[1] at n.7 (1978)). Because "a plaintiff need not show the precise number of members in the class," "the relevance of the numerosity requirement to class certification may in appropriate cases be less significant where in fact class[-]wide discrimination has been alleged," and "where the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983).

Defendant's EEO-1 Reports indicate that it had 113 African-American employees in 2010; 116 African-American employees in 2009; 135 African-American employees in 2008; 126 African-American employees in 2007; and 131 African-American employees in 2006. (Doc. 27-12.)  The court finds that joinder of the discriminatory promotion, training, and/or compensation claims of 100 or more African-American employees is not practical. Therefore, the court finds that plaintiffs have satisfied the numerosity requirement.  *See Camp v. City of Pelham*, No. 2:10-CV-1270-PWG, 2012 WL 7008393, *3 (N.D. Ala. Mar. 20, 2012).

### 2.  Commonality – Fed. R. Civ. P. 23(a)(2)

This court can certify the class only if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).   According to the Supreme Court,

> Commonality requires the plaintiff to demonstrate that the class members "have **suffered the same injury**," [*General Telephone Co. of Southwest v.*] *Falcon*, [457 U.S.] at 157, 102 S. Ct. 2364 [(1982)].  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways – by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  ***Their claims must depend upon a common contention*** – example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that ***it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke***.

26

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)(emphasis added).  This court has noted, "The prosecution of disparate treatment claims, 'while not dispositive, weighs against finding the commonality and typicality required by Rule 23.'" *Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 539 (N.D. Ala. 2001)(citations omitted).  "At the certification stage, the court must be able to infer that the class members suffered from a common policy of discrimination that pervaded the challenged employment decisions.  Because disparate treatment claims are by their very nature individual, the class treatment of these claims requires close scrutiny of the proposed class and their claims." *Id*.

In their Motion, Plaintiffs argue:

Here, Plaintiffs challenge a uniform company-wide system for making employment decisions, the components of which cannot credibly be disputed. They are:

(i)     a supervisor's recommendation is the indispensable and single most important factor in the process of deciding who will receive what employment benefit;

(ii)    supervisors are given no written instructions pertaining to the qualifications necessary for promotion (i.e. they are given nothing in writing telling them what to look for in making their recommendation) and candidates are pre-selected and groomed for promotion;

(iii)   the standards for receiving pay increases, promotions, and training, which are said to be determinative, are vague and subjective;

(iv)    hourly employees are not notified of promotion opportunities because the Defendant does not post job vacancies nor are hourly employees notified of the qualifications to get certain jobs;

27

(v)      hourly employees are not notified of training opportunities because the Defendant does not post such information denying the Plaintiffs and the class they seek to represent the opportunity to compete for better pay and/or promotions; [and]

(vi)     there are no effective safeguards or procedures designed to avert discriminatory practices.

The 11th Circuit and other courts have long held that the above enumerated practices, ***when coupled with statistical evidence of discrimination***, conclusively prove discrimination. *James*, 559 F.2d at 345;[16] *Caridad v. Metro-North Commuter Railroad*, 191 F.3d 283, 291-92 (2nd Cir. 1999)(in a challenge to a policy of delegating discretionary authority to supervisors, statistical evidence of discriminatory outcomes together with anecdotal evidence satisfied commonality requirements); *Sledge v. J.P. Stevens & Co.*, 585 F. 2d 625, 635 (4th Cir. 1978)("where strong [statistical] proof is coupled with evidence that the defendant based . . . decisions upon the subjective opinions of white supervisors, the trial court is entitled to infer, as it did here, that the defendant illegally discriminated"). Furthermore, the specific employment practices challenged here present common questions capable of "generat[ing] common answers apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551. These questions include: (1) ***whether Southland Tube has engaged in a pattern and practice of disparate treatment to its African-American employees through its maintenance of a company-wide selection system devoid of any fixed or reasonably objective standards for promotions, pay increases, and training***; (2) whether injunctive relief and other equitable remedies are warranted for the Injunctive relief class; and (3) whether other equitable remedies, back and front pay, punitive and compensatory damages are warranted.

_____

[16]In *James v. Stockham Valve*, the old Fifth Circuit held that standard-less, "largely subjective selection process . . . presents a ready mechanism for discrimination," and "Such subjective procedures when combined with [1] statistical evidence on the ***grossly disproportionate number of blacks selected*** for the apprenticeship program since 1971; [2] the invalidated testing, educational, and age requirements that adversely affect blacks and [3] the continuation of segregated facilities and programs until 1974, make a conclusive showing of present discriminatory practices." *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 345 (5th Cir. 1977)(footnote and internal quotations omitted).

(Doc. 29-1 at 39-40 [emphasis and footnote added].)[17]  However, defendant contends, "No combination of Plaintiffs' statistical and anecdotal evidence supports a finding that [defendant's] alleged practice of excessive subjectivity and discretion resulted in a pattern and practice of race discrimination in decisions regarding pay, job training, and promotions. Accordingly, plaintiffs have failed to meet their burden of proving commonality." (Doc. 31 at 55.)

"To establish a 'pattern or practice' of disparate treatment, the plaintiff must show that intentional discrimination was the employer's 'standard operating procedure.'  The plaintiff can prove that discrimination was the standard operating procedure 'through a combination of statistics and anecdotes.'"  *Cooper v. Southern Co.*, 390 F.3d 695, 716 (11th Cir. 2004)(quoting *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  "To meet this burden of proof, a plaintiff must prove more than the mere occurrence of isolated or accidental or sporadic ***discriminatory*** acts."  *Joe's Stone Crab*, 220 F.3d at 1286-87 (emphasis added).  "While pattern or practice cases are a variant of the disparate treatment theory and thus proof of discriminatory motive is critical, statistical evidence often is used to establish the existence of a pattern or practice. A plaintiff may establish a pattern or practice claim through a combination of strong statistical evidence of disparate impact

---

[17]The court notes that whether injunctive relief is appropriate and whether plaintiffs are entitled to money damages are issues that do not affect the court's determination of whether there are issues common to the class under Fed. R. Civ. P. 23(a)(2).

coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." *Id*. at 1287 (internal citations and quotations omitted).

In this case plaintiffs contend that their evidence of discretionary decisionmaking based on subjective factors and the lack of posting job and training opportunities is proof of a pattern or practice of intentional race discrimination. However, the Supreme Court has stated that proof of a subjective selection process is not proof of discrimination. *Dukes*, 131 S. Ct. at 2554; *see also Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 999 (1988). In this Circuit, "subjective reasons are not the red-headed stepchildren[18] of proffered nondiscriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons." *Chapman v. AI Transport*, 229 F.3d 1012, 1033-34 (11th Cir. 2000)(footnote added); *see also Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001)("Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes."). Also, the failure to post openings and/or opportunities as well as the preselection of candidates do not "necessarily indicate racial discrimination." *Springer v. Convergys Customer Management Group, Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007); *see Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 796-97 (11th

---

[18]"In common parlance, a red-headed stepchild is one 'who is neglected, mistreated or unwanted.'" Michael L. Rich, *Brass Rings and Red-Headed Stepchildren: Protecting Active Criminal Informants*, 61 Am. U.L. Rev. 1433, 1535 n.5 (June 2012)(citation omitted).

Cir. 1988); *see also Scott v. Rite Aid of Georgia, Inc.*, 918 F. Supp. 2d 1292, 1303 n.12 (M.D.

Ga. 2013)("[T]he law in the Eleventh Circuit is clear that preselection of a candidate or a

failure to post a job, even in violation of company policy, does not necessarily indicate

discrimination." (citing *Springer*, 509 F.3d at 1350; *Nance v. Ricoh Elec., Inc.*, 381 Fed.

Appx. 919, 922 (11th Cir. 2010); *Alexander v. Baldwin County Bd. of Educ.*, No. 07-0333-

CB-C, 2008 WL 3551194, at *7 (S.D. Ala. Aug. 12, 2008))).  Indeed, proof that defendant's

decision-making employees made selections based on unrestrained discretion using standard-

less subjective factors does not prove that the decisionmakers acted with a discriminatory

motive toward the class as a whole or that "intentional discrimination was [defendant's]

standard operating procedures." *Cooper v. Southern Co.*, 390 F.3d 695, 716 (11th Cir. 2004).

Rather, "[t]he plaintiff can prove that discrimination was the standard operating

procedure 'through a combination of statistics and anecdotes.'" *Id*.  For purposes of deciding

the issue of class certification for a "pattern or practice" disparate treatment decision, this

court must "evaluate the statistical evidence the plaintiffs submitted in order to determine

whether it established the discrimination of which plaintiffs complained." *Id*.  The named

plaintiffs have not presented any statistical evidence of a disparity between white and

African-American employees with regard to promotions and training; also, the statistical

evidence presented in support of plaintiffs' compensation claims does not demonstrate a

statistically significant difference between African-American and white employees with

regard to compensation.

Plaintiffs' expert, Grigg, testified that (1) more blacks than whites were paid below the median wage rate, and (2) when he compared a white employee in the same position with the same years of service, he noted that more African-Americans were paid less than the white comparator.  However, he testified that he could not say that there was a statistically significant disparity in pay between white and African-American employees or than the disparity in pay was attributable to an employee's race.   What percentage of decisions were based on intentional discrimination "is the essential question on which [plaintiffs'] theory of commonality depends." *Dukes*, 131 S. Ct. at 2554.  Like the sociological expert in *Dukes*, Grigg's testimony, as far as it goes, is "worlds away from 'significant proof' that [defendant] 'operated under a general policy of discrimination.'" *Id.*

Despite significant opportunity to conduct discovery, plaintiffs submitted no statistical evidence of a disparity between African-American and white employees with regard to promotions and training.  Although African-American employees are approximately 50% of the production workforce, they appear to be under-represented in the Front-Line Supervisor and Superintendent positions.  However, plaintiffs submitted no statistical evidence tending to show that the lack of African-American Front-Line Supervisors and Superintendents is the result of race discrimination.  The picture of any racial disparity is even less clear with regard to training and promotions to hourly positions below Front-Line Supervisor:  plaintiffs have not presented evidence of the racial composition of these positions and Swann testified he had no real input into these decisions.

Although plaintiffs have presented evidence that defendant makes decisions on promotions, training, and compensation for hourly production employees without any established standards and based on subjective factors, they have not produced evidence that defendants make such decisions based on race.  There is no evidence that African-American employees are denied the same promotions, training, and compensation as white employees in statistically-significant numbers.  Plaintiffs' "common contention" – that defendant uses the unfettered discretion of Front-Line Supervisors, Superintendents, and the Operations Manager and the lack of established procedures for posting job openings and training opportunities to intentionally discriminate against African-American employees – without any showing of statistically significant disparities between African-American and white employees, does not resolve any issue central to the validity of the class members' pattern or practice of disparate treatment claims.   Contrary to plaintiffs' position, the manner in which defendant makes its decisions is not a common fact among the members of a pattern-or-practice class without some showing of discriminatory intent.

Because the record does not contain significant proof of a statistically-significant disparity based on race, the court finds plaintiffs have not established that the claims of the named class members share a common contention of fact or law.

### 3.  Typicality – Fed. R. Civ. P. 23(a)(3)

"A class representative must possess the same interest and suffer the same injury as the class members in order to be *typical* under Rule 23(a)(3)."  *Cooper*, 390 F.3d at 713

(quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001))(emphasis added). Although the commonality and typicality requirements may overlap, "[t]raditonally, commonality refers to the group characteristics of the class as a whole [and] typicality refers to the individual characteristics of the named plaintiff [or plaintiffs] in relation to the class." *Id*. at 714 (quoting  Murray, 244 F.3d at 811).

> The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.  A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).  The typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories.

*Williams v. Mohawk Industries, Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009).

This court has noted that "Typicality is satisfied where the claims of the class representatives arise from the same broad course of conduct [as] the other class members and are based on the same legal theory."  *Wright*, 201 F.R.D. at 542-43 (citations omitted). "While typicality does not require a complete identity of claims, typicality may be defeated if factual differences dominate."  *Id.* at 545 (internal quotation and citation omitted).  Also, "Typicality is not present if the class representatives are subject to unique defenses that could be central to the litigation."  *Id.*

Even though the evidence indicates that all plaintiffs worked in a single location and that most, if not all, of the decisions at issue, were approved by the Operations Manager, the named plaintiffs' claims of disparate treatment are primarily individual claims of alleged

discrimination and do not support a finding of typicality reqired for a class action. Plaintiffs share the common characteristic of being African-Americans and being current and former employees of defendant. However, their allegations of discriminatory treatment are highly individualized. Plaintiffs were employed in different positions and they desired different promotions and training. Some testified that they asked their Front-Line Supervisors and Superintendents for training and promotions; some testified they did not ask for a promotion or training because defendant did not post such opportunities. Some plaintiffs had issues with job performance and/or attendance that made them unlikely candidates for promotions or merit raises. Others were promoted numerous times. Also, defendant has stated that its reasons for selecting, or not selecting, certain individuals for promotion, training, and/or merit raises are specific to the individual and not based on a policy of race discrimination.

The court finds that resolution of plaintiffs' claims will require resolution of numerous facts unique to their individual claims. Therefore, the court finds that plaintiffs have not demonstrated that their claims are typical of the claims of the proposed class.

### 4. Adequate Representation – Fed. R. Civ. P. 23(b)(4).

Defendant does not address whether the named plaintiffs are adequate representatives of the class. Nevertheless, the court notes no obvious conflict of interest between the named plaintiffs and the class members. Also, plaintiffs' counsel can adequately prosecute this action.

For the reasons set forth  above, the court finds that the named plaintiffs have not established that there are questions of law or fact common to the class and that the claims and defenses of the parties are not typical of the claims and defenses of the class.  Therefore, plaintiffs' Motion for Class Certification, will be denied.

## B.  RULE 23(b)

Because the court finds that plaintiffs have not satisfied the commonality and typicality requirement of Fed. R. Civ. P. 23(a)(2) and (3), the court pretermits discussion of whether plaintiffs could satisfy one of the Rule 23(b) requirements.  *See Abby v. Paige*, 282 F.R.D. 576, 579 (S.D. Fla. 2012); *Briggs v. Countrywide Funding Corp.*, 183 F.R.D. 576, 579 n.2 (M.D. Ala. 1997); *see also Likes v. DHL Exp.*  288 F.R.D. 524, 537 (N.D. Ala. 2012)(noting "no reason" to address rule 23(b) requirements after finding "three of the four prerequisites" of Rule 23(a) were lacking; but electing to analyze class under Rule 23(b)(2) and (3)).[19]

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that plaintiffs have failed to satisfy the requirements of Fed. R. Civ. P. 23(a)(2) and (3); therefore, their Motion for Class

---

[19]Nevertheless, the court notes that, given the lack of statistical evidence of a racial disparity in promotions, training, and/or compensation, plaintiffs have not established that certification is appropriate under Rule 23(b)(2).  Also, the court finds that individual issues predominate; therefore, certification is not appropriate under Rule 23(b)(3).

Certification, (doc. 24), is due to be denied.  An Order denying plaintiffs' Motion for Class

Certification, (doc. 24), will be entered contemporaneously with this Memorandum Opinion.

    **DONE**, this 29th day of September, 2013.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE